# STATE OF MICHIGAN

# COURT OF APPEALS

CYNTHIA PENNY,

Plaintiff-Appellee,

v

PHILLIP SCHULTZ and ESTATE OF
LORRAINE SCHULTZ by PHILLIP SCHULTZ
and DAVID SCHULTZ, Personal Representatives,

Defendants-Appellees,

and

ROWLEY'S AUCTION SERVICE, LLC,

Defendant-Appellant.

UNPUBLISHED
July 11, 2017

No. 331641
Macomb Circuit Court
LC No. 2015-001464-NO

Before: GADOLA, P.J., and METER and FORT HOOD, JJ.

PER CURIAM.

In this action alleging premises liability and negligence, defendant Rowley's Auction Service, LLC (RAS) appeals by leave granted[1] the trial court's order denying its motion for summary disposition pursuant to MCR 2.116(C)(10). We reverse.

RAS argues that the trial court should have summarily disposed of plaintiff's premises liability claim pursuant to MCR 2.116(C)(10) because it did not have a legal duty to plaintiff. We agree.

"This Court . . . reviews de novo decisions on motions for summary disposition brought under MCR 2.116(C)(10)." *Pace v Edel-Harrelson*, 499 Mich 1, 5; 878 NW2d 784 (2016). A motion for summary disposition pursuant to MCR 2.116(C)(10) "tests the factual sufficiency of the complaint[.]" *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). "In

---

[1] *Penny v Schultz*, unpublished order of the Court of Appeals, entered July 27, 2016 (Docket No. 331641).

-1-

evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Summary disposition is proper where there is no "genuine issue regarding any material fact." *Id*.

"In a premises liability action, a plaintiff must prove the elements of negligence: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the breach was the proximate cause of the plaintiff's injury, and (4) the plaintiff suffered damages." *Benton v Dart Props, Inc*, 270 Mich App 437, 440; 715 NW2d 335 (2006) (citation omitted). "In general, a premises possessor owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land." *Lugo v Ameritech Corp, Inc*, 464 Mich 512, 516; 629 NW2d 384 (2001). The parties do not dispute that plaintiff was an invitee while at the auction on the subject premises.

"A plaintiff may only recover from a defendant for injuries from conditions of a land if the defendant had legal possession and control of the premises." *Morelli v Madison Hts*, 315 Mich App 699, 702; 890 NW2d 878 (2016). In a premises liability case, the issue whether the defendant owed a duty to the plaintiff presents a question of law. *Id*.

> [P]remises liability is conditioned upon the presence of both possession and control over the land because the person in possession is in a position of control and normally best able to prevent any harm to others. [*Id*. at 702 (quotation marks and citation omitted).]

The Michigan Supreme Court has provided three definitions for a "possessor" in premises liability cases:

> A "possessor" is defined as:
>
> > (a) a person who is in occupation of the land with intent to control it or
> >
> > (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
> >
> > (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b). [*Merritt v Nickelson*, 407 Mich 544, 552; 287 NW2d 178 (1980) (internal quotations and citations omitted).]

In *Derbabian v S & C Snowplowing, Inc*, 249 Mich App 695, 703-704; 644 NW2d 779 (2002), this Court turned to dictionary definitions to define what it means to have possession and control of property.

> Black's Law Dictionary (7th ed) defines "possession," in this context, as "[t]he right under which one may exercise control over something to the *exclusion of all others*" (emphasis added). . . . Random House Webster's College Dictionary (1995), p 297, defines "control" as "exercis[ing] restraint or direction

-2-

over; dominate, regulate, or command." Similarly, Black's Law Dictionary defines "control" as "the power to . . . manage, direct, or oversee." *See also Lanzi v Great Atlantic & Pacific Tea Co*, 1999 WL 732963; 25 Conn L Rptr 342 (Conn Super, 1999). [*Derbabian*, 249 Mich App at 703 (footnotes omitted).]

As plaintiff points out, possession and control of a premises can be shared between two parties. *Siegel v Detroit City Ice & Fuel Co*, 324 Mich 205, 214; 36 NW2d 719 (1949); *Rockwell v Hillcrest Country Club, Inc*, 25 Mich App 276, 290; 181 NW2d 290 (1970). However, where the record evidence, viewed in the light most favorable to plaintiff, does not support a finding that RAS occupied 36094 Priestap Street with the intent to control it, the trial court's legal determination that RAS owed plaintiff a duty of care in this premises liability action was erroneous.

The record reflects that Phillip maintained and cared for the property at 36094 Priestap Street since his mother passed away in October 2013. Outside of the French doors where plaintiff fell, the parties agree that there were no steps or a porch leading from the doorway to the ground, and the door led to a several foot drop straight to the ground. Phillip testified during his deposition that this condition had existed since the home was built. In June of 2014, Phillip contacted RAS regarding his intent to hold an estate sale, in the form of an auction, at the house. Specifically, Phillip met with Brian Rowley, RAS's principal, to negotiate the contract. On June 10, 2014, Phillip and Brian signed a contract for RAS to perform the auction on August 2, 2014. RAS was to be paid a 25% commission on all items sold, and was responsible for setting up and running the auction, collecting money from the winning bidders, and paying Phillip his share within 10 business days. The day before the auction, employees of RAS attended the subject property to set up for the event, and Phillip secured the premises by locking the doors after they had finished. RAS employees used the French doors to move some of the personal property from the house to the outside. At one point, Phillip expressed to Brian his concern regarding whether the house could be sold without a deck outside the French doors, and Brian replied that "[Brian] would take care of it." Likewise, when Phillip asked about mounting yellow caution tape in front of the doors, Brian again stated that "[Brian would] take care of it." According to Phillip, when Brian said he would take care of everything, Phillip understood that to mean that RAS would, in addition to running the estate auction, "secure the premises."

During his deposition, Brian denied that a conversation took place with Phillip where Brian agreed to "take care of it" in reference to securing the French doors and the drop off to the ground outside the doors. Similarly, Greg Rowden testified that RAS will only mount warning signs or caution tape at auctions on the request of the owner to the property. In contrast, Nicole Rowley testified that RAS would sometimes put up caution tape or "watch your step" signs around obvious dangers on property where auctions were held.[2] According to Nicole's deposition testimony, Greg or Brian would make those decisions. On the day of the auction, while Phillip did not believe he needed to be present for the auction, he remained at the home, and at one point ushered out auction attendees who had entered the home and were participating

---

[2] Greg Rowden and Nicole Rowley both work for RAS.

in the auction through the open French doors, concerned that having the French doors open during the auction was unsafe.

Contrary to the trial court's conclusion, the record, viewed in the light most favorable to plaintiff, simply does not support a legal conclusion that RAS occupied the property at 36094 Priestap with the intent to control the property. Instead, the record confirms that Phillip hired RAS to conduct an auction of the personal property at 36094 Prisetap, as well as the house itself, and that RAS's activities on the premises were limited to that purpose. Put another way, the record does not reveal any indication that RAS was exercising restraint, or directing matters related to the premises. *Derbabian*, 249 Mich App at 703. For example, the deposition testimony of Phillip, Brian, Greg and Nicole confirms that RAS staff undertook efforts to arrange the personal property from 36094 Priestap in a manner that would allow the personal property to be auctioned off. The contract language between RAS and Phillip likewise confirms that RAS was engaged to conduct the auction on the subject property. Notably, there is no language in the contract between Phillip and RAS where RAS undertook to manage the premises or maintain its safety for the auction participants. Of particular import, Phillip acknowledged in his deposition that RAS did not hold a key to 36094 Priestap, that he had to be in attendance to allow RAS staff access to the property, and he secured the property by locking it at the end of the day following the conclusion of the auction after RAS staff departed. Specifically, during his deposition Phillip testified that while he did not believe he needed to be there during the auction, either he or his brother David would need to attend the premises at the end of the auction to lock up the premises. According to Brian, RAS's sole responsibility in assisting Phillip with the sale of the house itself was to "establish a price for the family, that's it . . . ." Brian further testified that RAS was not responsible for evaluating the state of the premises, and that any safety measures, such as mounting warning signs or caution tape, were done only at the request of the owner of the property. According to Brian, the homeowner alone was responsible for maintaining the safety of the premises. In Brian's words, the property at 36094 Priestap would be sold to a potential buyer "as is[.]" Greg confirmed Brian's testimony, noting that the personal property in the home, as well as the home itself, were to be sold "as is" without any warranty, and that any safety precautions RAS undertook would only be at the request of the owner of the property. Under these circumstances, RAS's activities in running the auction at 36094 Priestap simply do not rise to the level of RAS occupying the property with the concomitant intent to control it. *Merritt*, 407 Mich at 552.

We also observe that to hold RAS liable under these circumstances would not further the purpose that underlies the legal rationale requiring "actual possession and control[,]" where RAS simply did not have "the *power to prevent the injury* . . . [.]" *Kubczak v Chemical Bank & Trust Co*, 456 Mich 653, 661; 575 NW2d 745 (1998). Instead, the record reflects that the lack of a porch or any stairs outside of the doorway through which plaintiff fell had existed since the home was built and that the Schultz family was well-aware of the condition, to the point that Phillip expressed concern about it to Brian in the time leading up to the auction. The record also reflects that while the auction was conducted, Phillip was concerned about the potentially dangerous condition of the French doors being left open, and he closed the doors himself. During questioning by plaintiff's counsel, Phillip also acknowledged that RAS staff only had permission to be on the premises because he had executed an agreement with RAS allowing them to be there. Therefore, on this record, the trial court erred as a matter of law in concluding that RAS owed a duty of care to plaintiff.

-4-

RAS alternatively argues that it did not have a legal duty to plaintiff because the danger was open and obvious. We agree, and notwithstanding our conclusion that RAS did not have a duty to plaintiff, will briefly address this issue.

"In general, a premises possessor owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land." *Lugo*, 464 Mich at 516. However, "there is no obligation to warn someone of dangers that are so obvious and apparent that a person may reasonably be expected to discover them and protect himself or herself." *Laier v Kitchen*, 266 Mich App 482, 487; 702 NW2d 199 (2005) (citation omitted). "Accordingly, the open and obvious doctrine should not be viewed as some type of 'exception' to the duty generally owed invitees, but rather as an integral part of the definition of that duty." *Lugo*, 464 Mich at 516. "Whether a danger is open and obvious depends on whether it is reasonable to expect that an average person with ordinary intelligence would have discovered it upon casual inspection." *Hoffner v Lanctoe*, 492 Mich 450, 461; 821 NW2d 88 (2012). When considering whether a defect is open and obvious, courts must consider the "objective nature of the condition of the premises at issue[.]" *Lugo*, 464 Mich at 524. *In Blackwell v Franchi*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 328929); slip op at 2, this Court recently recognized that "[a]s a general rule a drop-off, like a step, does not in and of itself create a risk of harm if . . . a reasonable person can readily traverse it without incident." (opinion by SHAPIRO, J.).

Having reviewed the record evidence in the light most favorable to plaintiff, we conclude that the trial court erred in determining that the lack of steps and approximately three foot drop to the ground beyond the French doors did not amount to an open and obvious condition. During her deposition, plaintiff, who is the daughter of Phillip's girlfriend, testified that she had previously visited 36094 Priestap in late October 2013 to attend the funeral for Phillip's mother. Plaintiff spent approximately seven to eight hours at 36094 Priestap the day of the auction, and she testified that she spent time in the front of the house, as well as the side of the house, and she did not go in the backyard where the lack of steps or a porch outside of the French doors would have been visible to her. She also denied having any awareness of the lack of steps outside the French doors, or the drop to the ground. Plaintiff acknowledged that she walked into the dining room during the earlier part of the auction, and that while the French doors were closed, she could "see out." Plaintiff subsequently entered the dining room for a second time later that day, and the unfortunate accident leading to this appeal took place when she ran to grab her 15-month-old daughter who had unexpectedly darted toward the French doors. Plaintiff also presented the November 24, 2004 affidavit of Brandon Lemmex,[3] who averred that when he stood in the dining room of 36094 Priestap on August 2, 2014, he could not "see that there were no stairs located outside [the French doors], or that there was a drop of several feet, straight down to the ground below the [French doors] due to the wood paneling on the [French doors] which covered their bottom half and obscured one's view of the outside." Notably absent from

---

[3] We note that the copy of Lemmex's affidavit submitted in support of plaintiff's response to RAS's motion for summary disposition, as well as the copy included with her brief on appeal, were not sworn under oath.

his affidavit is any indication of where Brandon was standing in the dining room of 36094 Priestap when he concluded that he could not see the lack of stairs or drop-off outside of the French doors.

Nicole also testified in her deposition with regard to the drop-off that she did not "remember paying attention to it until I got into [the dining room] at that point when [plaintiff's daughter] fell or jumped out[ ]" of the French doors. Before that time, Nicole did not know there was a drop-off outside of the French doors. Similarly, Greg agreed during his deposition with plaintiff's counsel that there was nothing "obvious" from the French doors from the inside that would lead an individual to conclude that there was a dangerous condition outside of the door. Notably, Nicole, Brandon and Greg did not testify that on approaching the doors and looking outside, the lack of steps or drop-off to the ground were not readily discernable. Put another way, there was nothing hidden about the lack of steps and the drop-off outside of the French doors, and there is nothing in the record to suggest that anyone approaching the French doors would not become aware of the lack of steps or drop-off to the ground outside of the doors. See *Perkoviq v Delcor Homes-Lake Shore Pointe, Ltd*, 466 Mich 11, 16; 643 NW2d 212 (2002) (noting that a "classic example" of an open and obvious danger existed where frost and ice on a roof were not hidden, and one encountering the condition would become aware of the slippery conditions). While we recognize that plaintiff contended that she could not see the lack of steps and drop-off while in the dining room because of the wood paneling at the bottom portion of the French doors, there is nothing in the record to suggest that an individual would not have observed the dangerous condition on approaching the French doors more closely or traversing through the doors. In sum, the record does not reflect that "an ordinary user[,] upon casual inspection[,] could not have discovered" the existence of the lack of steps or the drop-off to the ground. *Blackwell*, ___ Mich App at ___; slip op at 2 (opinion by SHAPIRO, J.).[4]

We also reject plaintiff's contention that the dangerous condition was marked by "special aspects" that rendered an otherwise open and obvious condition "an unreasonable risk of harm[.]" *Lugo*, 464 Mich at 517. While we acknowledge plaintiff was injured while chasing her 15-month-old daughter, the open and obvious condition was not "effectively unavoidable[ ]" such as the situation presented in *Lugo*, of "a commercial building with only one exit for the general public where the floor is covered with standing water." *Id*. at 518. We are not persuaded on this record, taking all circumstances into account, that the "limited exception" of special aspects is applicable here, as instructed by the Michigan Supreme Court in *Hoffner*, 492 Mich at 462.

> It is worth noting *Lugo's* emphasis on the narrow nature of the "special aspects" exception to the open and obvious doctrine. *Under this limited exception, liability may be imposed only for an "unusual" open and obvious*

---

[4] This case is distinguishable from the Court's decision in *Blackwell*, where in that case, the plaintiff presented the testimony of several witnesses confirming that a drop-off into a mud room at the defendants' home "was not discoverable at the time she encountered it." *Blackwell*, ___ Mich App at ___; slip op at 3 (opinion by SHAPIRO, J.).

*condition that is "unreasonably dangerous" because it "present[s] an extremely
high risk of severe harm to an invitee" in circumstances where there is "no
sensible reason for such an inordinate risk of severe harm to be presented." The
touchstone of the duty imposed on a premises owner being reasonableness, this
narrow "special aspects" exception recognizes there could exist a condition that
presents a risk of harm that is so unreasonably high that its presence is
inexcusable, even in light of its open and obvious nature.* [*Id.* (footnote and
citation omitted; emphasis added).]

Finally, RAS argues that the trial court erred in not granting summary disposition of
plaintiff's claim alleging negligence where her claims sounded in premises liability, rather than
negligence. We agree.[5]

"Michigan law distinguishes between claims arising from ordinary negligence and claims
premised on a condition of the land." *Lymon v Freedland*, 314 Mich App 746, 756; 887 NW2d
456 (2016) (citation omitted). "It is well settled that the gravamen of an action is determined by
reading the complaint as a whole, and by looking beyond mere procedural labels to determine the
exact nature of the claim." *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 710-711;
742 NW2d 399 (2007). This Court is not bound by the labels the parties attached to their claims.
*Jahnke v Allen*, 308 Mich App 472, 475; 865 NW2d 49 (2014). With respect to a premises
liability claim, "liability arises solely from the defendant's duty as an owner, possessor, or
occupier of land." *Buhalis v Trinity Continuing Care Servs*, 296 Mich App 685, 692; 822 NW2d
254 (2012). Comparatively, "[o]rdinary negligence claims are grounded on the underlying
premise that a person has a duty to conform his or her conduct to an applicable standard of care
when undertaking an activity." *Lymon*, 314 Mich App at 756. "If the plaintiff's injury arose
from an allegedly dangerous condition on the land, the action sounds in premises liability rather
than ordinary negligence; this is true even when the plaintiff alleges that the premises possessor
created the condition giving rise to the plaintiff's injury." *Buhalis*, 296 Mich App at 692.

Plaintiff alleges that RAS's failure to lock the doors or to put up warning signs around the
danger created a claim of negligence. Her argument is that the actions of RAS's employees, and
therefore RAS itself, fell below the standard of care, i.e. either to lock the French doors or put up
warning signs about the drop-off. Reading the entire complaint as a whole and disregarding
plaintiff's labels for her claims, *Jahnke*, 308 Mich App at 475, the gravamen of plaintiff's claims
clearly lie solely in premises liability. Plaintiff's "injury arose from an allegedly dangerous
condition on the land," which was the lack of stairs from the house to the ground outside of the

---

[5] We note that, despite the argument by plaintiff that this issue is not preserved due to the trial
court's omission of discussing the issue on the record, the issue is preserved where the trial court
inherently decided the issue by denying RAS's motion in its entirety in a written order.
*Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015) (internal quotations
omitted) (holding that issues are preserved for review before this Court when they are "raised
before and decided by the trial court.").

French doors. *Buhalis*, 296 Mich App at 692. As such, the trial court erred in denying RAS's motion for summary disposition regarding plaintiff's claim of ordinary negligence.

Reversed and remanded for entry of an order granting summary disposition in favor of defendant RAS. We do not retain jurisdiction. Defendant RAS, as the prevailing party, may tax costs pursuant to MCR 7.219.

/s/ Michael F. Gadola
/s/ Patrick M. Meter
/s/ Karen M. Fort Hood